* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission affirms in part and modifies in part the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff and defendant-employer.
3. The carrier on the risk is St. Paul Travelers Insurance Company.
4. Plaintiff's average weekly wage as shown on the Form 22 Wage Chart is $419.83, yielding a compensation rate of $279.90 per week.
5. Plaintiff was diagnosed with right carpal tunnel syndrome on or about August 18, 2003.
6. Plaintiff's compensable right carpal tunnel syndrome arose out of and in the course of plaintiff's employment.
7. The parties stipulated the following documentary evidence:
 a. Stipulated Exhibit #1: I.C. Forms, Employment Security Commission file, discovery responses
 b. Stipulated Exhibit #2: Medical records
8. The issues before the Full Commission are whether plaintiff's left carpal tunnel syndrome constitutes a compensable occupational disease; whether plaintiff's ganglion cyst constitutes a compensable injury; whether plaintiff's August 5, 2004 surgery is compensable; whether plaintiff is disabled as a result of a compensable occupational disease or injury; and whether plaintiff's benefits should be terminated because she is no longer disabled and/or she refused suitable employment.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following: *Page 3 
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 32 years old and had completed the eleventh grade in high school.
2. Plaintiff began her employment with defendant-employer on December 17, 1997. Plaintiff worked in the fuel injector area for approximately three years and began work in the pump side department in 2002.
3. Plaintiff's job duties in the pump side required her to work on an assembly line that built 75 pumps per hour and 700 pumps per day. Plaintiff was responsible for putting components into the pump as it came down the line. The components were located in a bin beside her and plaintiff was required to use a drill to torque the parts into pump. Plaintiff divided her day between working on the line and working in the assembly area where she put components together to install into the pump as it came down the line.
4. In June 2002, plaintiff noticed that a lump had formed on her right wrist. Over the course of the next year, the lump increased in size. In late July 2003, plaintiff told her supervisor about the lump and that she was having numbness and tingling from her right fingers to her elbow, along with pain and swelling. Plaintiff's supervisor instructed her to find a doctor and have it checked. Plaintiff made arrangements for an appointment with Dr. Derrick Hickey for August 10, 2003. Because of the pain, plaintiff bought a brace to wear at work until her appointment. The plant manager approached plaintiff about the brace and directed her to see the plant safety director. The safety director made an appointment for plaintiff to be evaluated by Dr. Maxwell Kasselt on August 18, 2003. *Page 4 
5. On August 10, 2003, plaintiff presented to Dr. Hickey, who diagnosed her with carpal tunnel syndrome and a ganglion cyst in her right hand. Dr. Hickey recommended surgery to release her carpal tunnel and also to remove the cyst.
6. On August 18, 2003, plaintiff presented to Dr. Kasselt. Dr. Kasselt also diagnosed plaintiff with carpal tunnel syndrome in her right hand. Dr. Kasselt ordered EMGs and gave plaintiff braces to wear while she was at work.
7. On August 25, 2003, Dr. Hickey performed arthroscopic surgery on plaintiff's right wrist for debridement and excision of the cyst. Plaintiff was out of work from August 25, 2003 through September 18, 2003. Dr. Hickey was unable to state whether there was a causal relationship between plaintiff's employment with defendant-employer and the development of the cyst.
8. Plaintiff returned to work after her surgery. She continued to have problems with her right wrist and continued to treat with Dr. Kasselt for carpal tunnel syndrome. Defendant-carrier authorized Dr. Kasselt to perform right carpal tunnel surgery on plaintiff, and the surgery was performed on December 23, 2003. Dr. Kasselt returned plaintiff to light-duty work on December 24, 2003, with restrictions of wearing a wrist splint, no heavy lifting, and no repeated tight gripping; however, due to the Christmas holiday, plaintiff did not return to work until January 7, 2004.
9. Plaintiff returned to work in the bond room. Plaintiff's responsibilities included adding a part to the nozzles before they could be packed into boxes of 50. Plaintiff had to screw on a seal called a "doughnut" before placing the item into the machine for it to be tightened. Then, plaintiff would fill the boxes, seal them and move them to the crates. Plaintiff rotated through other jobs in the bond room, including taking paint off of the nozzles, putting seals onto *Page 5 
the nozzles, and capping the nozzles. Plaintiff stated that all of the positions required her to grip and twist with her right hand. As a result, plaintiff had difficulties meeting her production standards.
10. After her return in January 2004, plaintiff began to experience pain and numbness in both of her hands. Plaintiff reported the condition to supervisors Pat Peterson and Kathy Parikh. On January 22, 2004, plaintiff presented to Dr. Kasselt with complaints of severe pain in her right hand radiating up to the elbow and occasionally to the shoulder. She also complained of "altered sensation in all aspects of her hand." Dr. Kasselt stated that plaintiff's complaints and other factors led him to believe that plaintiff was amplifying her symptoms.
11. On February 26, 2004, plaintiff presented to Dr. Kasselt with complaints of pain in her left wrist and limb. Dr. Kasselt diagnosed plaintiff with probable carpal tunnel syndrome that was probably work-related, but he requested to review a video of plaintiff's job before offering a definitive opinion regarding causation.
12. On April 20, 2004, plaintiff sought a second opinion with orthopedic surgeon Dr. Kevin Scully, upon referral from Dr. Kasselt. Plaintiff complained of bilateral numbness in her hands, worse on the right. Dr. Scully ordered nerve conduction studies and EMGs. The tests failed to demonstrate any significant ulnar neuropathy; however, Dr. Scully opined that plaintiff might have ongoing neurologic dysfunction, perhaps related to the ulnar nerve compression or to some degree recurring carpal tunnel issues. Plaintiff requested an exploration of both the median and ulnar nerves of the right wrist. Dr. Scully planned to schedule surgery upon approval by defendant-carrier.
13. In a letter dated June 2, 2004, Dr. Kasselt noted that he had reviewed the video of plaintiff's work activities and opined that plaintiff's right carpal tunnel syndrome was work *Page 6 
related. In the same letter, he opined that plaintiff's left hand condition was "more likely not work related."
14. On June 7, 2004, Dr. Kasselt found that plaintiff had clinical features to suggest an ulnar nerve neuropathy but that there was no neurophysiological confirmation from plaintiff's nerve conduction study on May 20, 2004. Dr. Kasselt believed that plaintiff's complaints were unjustified and anatomically impossible. He referred plaintiff to psychologist Dr. Gregory Gridley for testing to determine whether there were psychological factors contributing to plaintiff's physical complaints. Dr. Gridley opined that plaintiff was malingering, as did Dr. Kasselt after reviewing Dr. Gridley's findings.
15. Dr. Kasselt opined that based on her symptoms, plaintiff suffered "some type of nerve dysfunction" and characterized her condition as "mild." Due to the lack of clinical support for plaintiff's symptoms, Dr. Kasselt did not recommend surgery, but referred plaintiff to Dr. George Edwards for a third opinion. In a note dated June 11, 2004, Dr. Kasselt found plaintiff to be at maximum medical improvement following the December 23, 2003 surgery, "taking into account that the ulnar nerve dysfunction is a separate condition which I will deem work related so that the patient can have this problem addressed in the future as necessary." Dr. Kasselt explained the comment establishing the nerve dysfunction as a separate, work-related injury as an attempt to opine that he was unsure of the condition at the time, but should it later be found to actually exist, he believed the condition would be work-related. Dr. Kasselt assigned a five percent permanent partial impairment rating to plaintiff's right hand.
16. A functional capacity evaluation of plaintiff done on June 28, 2004 showed that plaintiff was capable of performing medium level work for an eight-hour day. *Page 7 
17. On July 1, 2004, plaintiff presented to Dr. George Edwards, an orthopedic surgeon specializing in hand surgery. Plaintiff complained of numbness of the right hand and mild symptoms of carpal tunnel on the left hand. Following an examination and review of plaintiff's records, Dr. Edwards diagnosed plaintiff with "bilateral cubital tunnel syndrome with questionable relationship to work and mild left carpal tunnel syndrome that may have been aggravated by her work." Dr. Edwards explained that cubital tunnel syndrome is caused by flexion of the elbow for prolonged periods of time, necessitating job duties that required plaintiff to flex her elbow greater than 90 degrees for ten to 30 minute periods, which was not supported by plaintiff's work history.
18. Dr. Edwards further opined that plaintiff had reached maximum medical improvement from her December 23, 2003 surgery, and rated her as having a permanent partial disability of seven percent to the right hand, of which five percent is related to the carpal tunnel syndrome and two percent to the ganglion cyst.
19. On August 5, 2004, plaintiff underwent right ulnar nerve transposition, right carpal tunnel release and exploration of right Guyon's canal surgery performed by Dr. Scully. Defendants did not authorize this surgery. Dr. Scully noted that during the surgery he found evidence of thickening scar tissue and other tissue squeezing the median nerve, supporting the diagnosis of right carpal tunnel syndrome. Regarding the ulnar nerve and Guyon's canal, he found dilated veins in the area of the ulnar nerve, which are "frequently present when you relieve compression of a nerve."
20. Dr. Scully kept plaintiff out of work until October 13, 2004, when she was released to return to work with permanent restrictions of rotating her work position and job duties every hour to prevent repetitive motion and lifting 20 to 30 pounds. He rated plaintiff *Page 8 
with a four percent permanent partial disability to the upper right extremity. Dr. Scully stated that plaintiff did not present to him with left wrist symptoms.
21. While the medical evidence tends to show that plaintiff's job duties aggravated her left carpal tunnel syndrome, the greater weight of the evidence fails to show that plaintiff's employment placed her at an increased risk of contracting left carpal tunnel syndrome when compared to the general public. Therefore, plaintiff's left carpal tunnel syndrome is not a compensable occupational disease.
22. Plaintiff failed to prove by the greater weight of the medical evidence that her ganglion cyst is work-related.
23. Plaintiff's right carpal tunnel syndrome is an admittedly compensable occupational disease. Further, the evidence found by Dr. Scully during the August 5, 2004 surgery is sufficient to show that plaintiff continued to suffer from right carpal tunnel syndrome, despite the release by Dr. Kasselt. Therefore, the Commission finds as fact that the August 5, 2004 carpal tunnel release surgery performed by Dr. Scully was work-related and compensable. However, the Full Commission finds that plaintiff's right cubital tunnel syndrome has not been shown to be work-related. Therefore, that portion of the August 5, 2004 surgery relating to plaintiff's right ulnar nerve transposition and exploration of right Guyon's canal is not work-related.
24. Upon her release to return to work, plaintiff informed the defendant-employer of her restrictions but they did not have any work available for her. Plaintiff received short-term disability benefits in the amount of $260.00 per week from August 12, 2004 through February 9, 2005, from an employer-funded policy. She was denied long-term disability benefits. Plaintiff *Page 9 
has not worked for defendant-employer since August 2004. She was terminated approximately one year later, at the end of her leave under the Family Medical Leave Act.
25. Plaintiff testified that after her termination, she registered with the Employment Security Commission (ESC) and the North Carolina Division of Vocational Rehabilitation. Plaintiff began looking for work on August 11, 2005 and continued to search for work for a month and a half. Employment Security Commission records indicate that plaintiff looked for work from August 21, 2005 through September 24, 2005. Plaintiff testified that she stopped her job search in part because she was told by ESC that she was not eligible for unemployment benefits. Plaintiff also explained that State Vocational Rehabilitation recommended she attend school for medical coding; however, the ESC informed her that she could not do that work because of her restrictions. Since March 2006, plaintiff has been attending classes at Coastal Community College to obtain her G.E.D. Plaintiff attends the program three days per week for eight hours per day. After September 25, 2005, plaintiff was capable of some work and has not looked for any work since she ended her job search, in part because her goal is to obtain a G.E.D.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff bears the burden of proving each element of compensability in order to prove the existence of an occupational disease under N.C. Gen. Stat. § 97-53(13). This requires plaintiff to show that (1) the disease must be characteristic of a trade or occupation; (2) the disease must not be an ordinary disease of life to which the public is equally exposed outside of the employment; and (3) there must be proof of causation. Hansel v. Sherman Textiles, *Page 10 304 N.C. 44, 283 S.E.2d 101 (1981). A disease is "characteristic" of the profession when there is a recognizable link between the nature of the job and an increased risk of contracting the disease in question.Booker v. Medical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
2. In the present case, plaintiff sustained an occupational disease of right carpal tunnel syndrome on August 18, 2003 as a result of her job duties for defendant-employer. Plaintiff's job placed her at an increased risk over that of the general public for developing the condition. N.C. Gen. Stat. § 97-53(13). However, plaintiff's ganglion cyst, cubital tunnel syndrome and left carpal tunnel syndrome are not compensable occupational diseases within the meaning of the law. N.C. Gen. Stat. § 97-53(13); Chambers v. Transit Mgmt., 350 N.C. 609,636 S.E.2d 553 (2006); Norris v. Drexel Heritage Furnishings, Inc.,139 N.C. App. 620, 534 S.E.2d 259 (2000), cert. denied, 353 N.C. 378,547 S.E.2d 15 (2001).
3. In order to meet the burden of proving continuing disability, plaintiff must prove that she was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that she is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that she is capable of some work, but that she has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that she is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that she has obtained other employment at wages less than her pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution, *Page 11 108 N.C. App. 762, 425 S.E.2d 454 (1993). When a plaintiff meets her burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms,Inc., supra.
4. In the present case, plaintiff was at maximum medical improvement on October 12, 2004 for her right carpal tunnel syndrome. Plaintiff has not worked since August 4, 2004, as defendant-employer did not have any work within her restrictions. After August 12, 2004 plaintiff remained on short-term disability until she was terminated by defendant-employer in August 2005. Plaintiff did look for work from August 21, 2005 until September 24, 2005. After September 25, 2005, however, plaintiff failed to show that she was unable to obtain employment after a reasonable effort or that it was futile for her to seek employment because of other factors. She was capable of some work and no doctor took her out of work. N.C. Gen. Stat. § 97-29; Russell v. Lowes Product Distribution,supra. Therefore, plaintiff is not entitled to temporary total disability benefits after September 25, 2005. N.C. Gen. Stat. § 97-29.
5. As a result of her compensable occupational disease, plaintiff was temporarily totally disabled and is entitled to receive temporary total disability compensation at the rate of $279.90 per week from August 5, 2004 through September 25, 2005. N.C. Gen. Stat. § 97-29.
6. As a result of her compensable occupational disease, plaintiff is entitled to receive compensation for her permanent partial disability rating of five percent to the right hand. N.C. Gen. Stat. § 97-31(12). Plaintiff is not entitled to the four percent rating to the right upper extremity provided by Dr. Scully since it is based in part upon the ulnar nerve condition which has been determined to be non-work related. N.C. Gen. Stat. § 97-31(13). See, Whitley v. Columbia Lumber Mfg.Co., 78 N.C. App. 217, 336 S.E.2d 642 (1985). *Page 12 
7. Plaintiff is entitled to have defendants pay for medical expenses incurred regarding her right carpal tunnel syndrome, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability, subject to the limitations of N.C. Gen. Stat. § 97-25.1. Plaintiff is not entitled to medical expenses for her ganglion cyst, left carpal tunnel syndrome, or right cubital tunnel syndrome. N.C. Gen. Stat. §§ 97-2(19); 97-25; 97-25.1.
8. Defendants are entitled to a credit for any amounts paid to plaintiff pursuant to an employer-funded disability plan from August 12, 2004 through February 9, 2005. N.C. Gen. Stat. § 97-42.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee approved below, defendants shall pay plaintiff temporary total disability compensation at the rate of $279.90 for the period from August 5, 2004 through September 25, 2005. This amount is subject to a credit for any amounts paid to plaintiff pursuant to an employer-funded disability plan from August 12, 2004 through February 9, 2005.
2. Subject to a reasonable attorney's fee approved below, defendants shall pay plaintiff permanent partial disability compensation for the five percent impairment to the right hand at the rate of $279.90 for ten weeks. *Page 13 
3. A reasonable attorney fee of 25% of the compensation due plaintiff under paragraphs 1 and 2 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel.
4. Defendants shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of her right carpal tunnel syndrome, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. Plaintiff is not entitled to medical expenses for her ganglion cyst, left carpal tunnel syndrome, or right cubital tunnel syndrome.
5. Defendants shall pay the costs.
This 2nd day of March, 2007.
 S/_________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_________________ PAMELA T. YOUNG COMMISSIONER